# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| EAGLE BEAR, INC. and WILLIAM BROOKE, | **CV-21-88-GF-BMM** |
| Plaintiffs, | |
| vs. | **ORDER ON PRELIMINARY INJUNCTION** |
| THE BLACKFEET INDIAN NATION and THE BLACKFEET TRIBAL COURT, | |
| Defendants. | |

## INTRODUCTION

Eagle Bear, Inc. ("Eagle Bear") and William Brooke (collectively, "Plaintiffs") brought this action against the Blackfeet Tribal Court and the Blackfeet Indian Nation ("Blackfeet Nation"). Plaintiffs seek declaratory and injunctive relief to prevent the Blackfeet Tribal Court from exercising jurisdiction over their dispute with the Blackfeet Nation. (Doc. 1.) Plaintiffs filed a motion for preliminary injunction on August 10, 2021. (Doc. 4.) The Court held a hearing on the motion on September 2, 2021. (Doc. 16.)

## BACKGROUND

The record currently before the Court relevant to its consideration of Plaintiffs' motion for preliminary injunction consists of the following documents:

- The April 11, 1997 lease agreement between Eagle Bear and the Blackfeet Nation. (Doc. 1-2.)
- Blackfeet Nation's July 16, 2021 complaint against Eagle Bear and William Brooke. (Doc. 1-3.)
- Blackfeet Nation's July 24, 2021 petition for attachment in Blackfeet Tribal Court. (Doc. 5-1.)
- William Brooke's affidavit. (Doc. 5-2.)

**2008 lease dispute**

- BIA Superintendent's January 15, 2008 notice of late payment to Eagle Bear. (Doc. 25-2.)
- BIA Superintendent's March 27, 2008 10-day notice to Eagle Bear. (Doc. 25-3.)
- BIA Superintendent's April 4, 2008 second 10-day notice to Eagle Bear. (Doc. 25-4.)
- BIA Superintendent's June 10, 2008 letter cancelling the lease. (Doc. 14-1 at 3.)
- Eagle Bear's June 18, 2008 notice of appeal of the lease cancellation. (Docs. 14-1 at 4; 25-6.)
- Eagle Bear's June 16, 2008 payment of 2007 rent. (Docs. 14-1 at 5; 25-5.)
- BIA's payment history for Eagle Bear. (Doc. 14-1 at 6-8.)
- Eagle Bear's withdrawal of the June 18, 2008 notice of appeal of the lease cancellation. (Docs. 14-1 at 9; 25-1.)

**2017 lease dispute**

- Blackfeet Nation's April 26, 2017 notice of default to Eagle Bear (Doc. 23-1.)
- Eagle Bear's April 28, 2017 response to notice of default (Doc. 23-2.)
- Eagle Bear's July 7, 2017 arbitration demand to Blackfeet Nation (Doc. 23-3.)

- Eagle Bear's July 13, 2017 arbitration demand to Blackfeet Nation (Doc. 23-4.)
- Blackfeet Nation's August 7, 2017 letter to the Bureau of Indian Affairs ("BIA"). (Doc. 1-4.)
- Eagle Bear's August 15, 2017 letter to the BIA. (Doc. 1-5.)
- BIA's September 7, 2017 decision requiring mediation. (Doc. 1-6.)
- BIA Superintendent's October 17, 2017 letter cancelling the lease agreement. (Doc. 1-7.)
- Blackfeet Nation's Dec. 14, 2017 letter to William Brooke. (Doc. 1-8.)
- Eagle Bear's appeal of the BIA's September 7, 2017 decision. (Doc. 1-9.)
- Eagle Bear's appeal of the October 17, 2017 cancellation. (Doc. 1-10.)
- BIA Regional Director's April 4, 2018 decision requiring mediation. Eagle Bear's appeal of the October 17, 2017 cancellation. (Doc. 1-11.)
- Blackfeet Nation's November 12, 2019 opening brief to the Interior Board of Indian Appeals ("IBIA"). (Doc. 1-12.)
- IBIA's March 2, 2021 decision denying expedited review. (Doc. 1-13.)
- Blackfeet Nation's July 28, 2021 motion to dismiss for mootness. (Doc. 1-15.)
- Eagle Bear's August 30, 2021 opening brief in opposition of Blackfeet Nation's motion to dismiss for mootness. (Doc. 18-8.)
- Eagle Bear's response to Blackfeet Nation's 2021 motion to dismiss for mootness (Doc. 5-3.)
- IBIA's August 10, 2021 decision denying Blackfeet Nation's motion to dismiss for mootness. (Docs 12-1; 14-1 at 1-2.)

The Court expects that the parties will develop the record further during the discovery and pre-trial motion processes. A preliminary "injunction is not a preliminary adjudication on the ultimate merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984). "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *U. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *see also Sierra On–Line*, 739 F.2d at 1423. The Court will

confine itself to the Parties' submitted documents in analyzing Plaintiffs' request for a preliminary injunction. The record, as presently constituted, contains significant gaps that impede the Court's ability to assess properly the likelihood of Plaintiffs' success on the merits.

The Blackfeet Nation and Eagle Bear entered into a lease agreement on April 9, 1997. (Doc. 1-2.) The lease provided Eagle Bear 53.6 acres to operate a KOA campground within the exterior boundaries of the Blackfeet Nation's tribal land. (*Id.* at 2.) The lease called for a term of 25 years. (*Id.* at 3.) Eagle Bear retained the option to extend the term for an additional 25 years, contingent to the Blackfeet Nation's right to purchase the lease extension. (*Id.* at 3-4.) The BIA approved and administered the lease. (*See id.* at 1; *also* 25 C.F.R. §§ 162.001 et seq.)

It appears from the record that Eagle Bear failed to uphold the terms of the lease. The lease required an annual payment of rent and royalties on November 30 of each year. (Doc. 1-2 at 4-5.) The record before the Court shows that Eagle Bear's 1997 rent payment was 32 days delinquent; the 1998 rent payment was 269 days delinquent; the 1999 rent payment was 272 days delinquent; the 2000 rent payment was 259 days delinquent; the 2001 rent payment was 229 days delinquent; the 2002 rent payment was 907 days delinquent; the 2003 rent payment was 207 days delinquent; the 2004 rent payment was 260 days delinquent; and the 2005 rent payment was 202 days delinquent. (Doc. 14-1 at 6-8.)

When Eagle Bear failed to pay the 2007 rent for 46 days, the BIA sent Eagle Bear notice stating "[y]ou are advised to make payment for this lease, or show cause why your lease should not be cancelled for non payment of the rent due." (Doc. 25-2.) Eagle Bear did not pay. The BIA sent another notice to Eagle Bear on Eagle Bear's 118th day of delinquency stating "[y]ou are advised to make payment *within 10 days of this notice* or show cause why your lease should not be cancelled for non payment of the rent due." (Doc. 25-3.)

The BIA sent another notice on the 126th day that Eagle Bear's rent was past-due in which it reiterated the 10-day period. (Doc. 25-4.) On the 193rd day without Eagle Bear's payment—75 days after the initial 10-day notice—the BIA finally took action. The BIA superintendent cancelled the lease between Eagle Bear and the Blackfeet Nation on June 10, 2008. (Doc. 14-1 at 3.) The BIA Superintendent informed Eagle Bear "that this lease is hereby cancelled." (*Id.*) The BIA's cancellation letter provided that Eagle Bear needed to file an appeal of the cancellation to the Rocky Mountain Regional Director within 30 days. (*Id.*)

Eagle Bear timely appealed the lease cancellation decision to the BIA Rocky Mountain Regional Director on June 18, 2008. (*Id.* at 4.) Eagle Bear explained that it had submitted its lease payments for the previous few years "after the summer camping season begins in late May or June." (*Id.*) Eagle Bear submitted rent payment to the BIA in trust for the Blackfeet Nation on that same date. (*Id.*) Eagle Bear

5

withdrew its appeal on January 5, 2009. (*Id.* at 9.) Eagle Bear based its withdrawal on "discussions with [BIA] realty staff." (*Id.*) In its letter withdrawing the appeal, Eagle Bear states that the BIA advised Eagle Bear that the annual payments were received, and "[a]ccordingly, the lease is current." (*Id.*) Nothing in the record indicates, however, that the BIA took any action at any level to rescind its decision to cancel the lease. The Rocky Mountain Regional Director of the BIA possessed the sole authority to overturn the lease cancellation. *See* 25 C.F.R. § 2.4.

Eagle Bear continued to operate as if the lease remained in effect until the Blackfeet Nation requested that the BIA cancel the lease on August 7, 2017. (Doc. 1-4 at 1.) The Blackfeet Nation complained in 2017 of several material breaches of the lease. (*Id.*) The BIA superintendent required mediation initially, but both the Blackfeet Nation and Eagle Bear appealed. The BIA superintendent determined that the lease should be cancelled on Oct 17, 2017. (Doc. 1-7 at 1.) Eagle Bear timely appealed the BIA superintendent's decision to the BIA Rocky Mountain Regional Director, who overturned the 2017 lease cancellation and ordered mediation and arbitration on November 17, 2017. (Doc. 1-10 at 1.) The Blackfeet Nation appealed the Regional Director's decision to the Interior Board of Indian Affairs ("IBIA"). (Doc. 1-12.) The IBIA denied expedited consideration of the issue (Doc. 1-13) and no progress was made on the appeal until July of 2021.

Through the production of the administrative record for the appeal to the IBIA the Blackfeet Nation became aware of the BIA's 2008 lease termination. (Doc. 1-15 at 1.) On the belief that the 2008 lease termination became final following Eagle Bear's withdrawal of appeal, the Blackfeet Nation filed a complaint in Blackfeet Tribal Court and a motion to dismiss as moot its appeal with the IBIA. (*Id.*) The IBIA denied the motion to dismiss on August 10, 2021, and instead stayed the appeal and authorized the BIA to act on the Tribe's request that the BIA either honor the June 10, 2008 cancellation or produce evidence that the cancellation had been reversed. (Doc. 14-1 at 1-2.) The Court knows of no further action by the IBIA on the appeal.

The Blackfeet Nation's complaint against Eagle Bear in the Blackfeet Tribal Court alleges the following claims: 1) illegal trespass seeking eviction; 2) accounting of Plaintiffs' rents and profits since June 10, 2008; 3) unauthorized use of Blackfeet Nation lands seeking illegally gained profits; 4) fraudulent misrepresentation seeking illegally gained profits; and 5) failure to follow the laws of the Blackfeet Nation seeking damages. (Doc. 1-3.)

## LEGAL STANDARD

The issuance of a preliminary injunction represents an extraordinary remedy that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008). A plaintiff who seeks a preliminary injunction or temporary restraining order must establish four elements: 1) that it will likely succeed on the merits; 2) that it will suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in its favor; and 4) that an injunction will serve the public interest. *See id.* at 20. Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The reviewing court must balance the elements "so that a stronger showing of one element may offset a weaker showing of another." *Id.* Even "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

## ANALYSIS

### I.   Preliminary Injunction Analysis

Plaintiffs allege that the Blackfeet Tribal Court lacks jurisdiction over the Blackfeet Nation's complaint for the following reasons: 1) the complaint raises issues of federal law; 2) William Brooke is not a member of the Blackfeet Tribe; 3) the Blackfeet Nation's claims are subject to BIA administrative proceedings; 4) The

BIA is an indispensable party; 5) the lease requires arbitration; 6) this Court has exclusive jurisdiction under the lease. (Doc. 5.)

### a.  Success on the Merits

Plaintiffs' arguments rely primarily upon the continued existence of the lease between Eagle Bear and the Blackfeet Nation. Whether Plaintiffs are likely to succeed on the merits thus depends largely upon whether the lease was ultimately cancelled by the BIA in 2008. The record at this stage appears to indicate that the BIA cancelled the lease for the reasons described below. (Doc. 14-1 at 3.)

### i.  The 2008 lease cancellation

The BIA had established a straightforward regulatory procedure to cancel non-agricultural leases on tribal lands for delinquent payment at the time of the dispute between Eagle Bear and the Blackfeet Nation in 2008 regarding late payments. A review of that regulatory framework follows. The BIA could "issue bills or invoices to a tenant in advance of the dates on which rent payments are due under a lease." 25 C.F.R. § 162.613 (2008). It remained "the tenant's obligation to make such payments in a timely manner." *Id.* A tenant's obligation would "not be excused if such bills or invoices [were] not delivered or received." *Id.* Untimely rent payments remain subject to interest accruing "by the due date [. . .] specified in the lease." 25 C.F.R. § 162.614 (2008). "A tenant's failure to pay rent in the time and

manner required by a lease [constitutes] a violation of the lease." 25 C.F.R. §
162.614 (2008).

The regulations further required the BIA to issue notice of a delinquent
payment violation within 5 business days of the date on which the rent payment was
due. *Id.* If the tenant failed to cure the violation "*within 10 business days*" of the
BIA's notice, the BIA could cancel the lease and take immediate action to recover
the unpaid rent. *Id.* (emphasis added); 25 C.F.R. § 162.618 (2008). The tenant had
the right to appeal a cancellation within 30 days of the notice of that cancellation. 25
C.F.R. § 162.621 (2008). A BIA superintendent's decision to cancel a lease for
delinquent payment could be overturned only by the BIA "Area Director" who
oversees the superintendent. 25 C.F.R. § 2.4.

Other than providing Eagle Bear excess time to pay its delinquent debts, the
BIA appears to have followed regulatory procedure when canceling the lease
between Eagle Bear and the Blackfeet Nation in 2008. The record indicates that
Eagle Bear was more than 5 days delinquent on its 2007 rent payment. (Doc. 14-1
at 6-8); *see* 25 C.F.R. § 162.614 (2008). The BIA gave 10-days notice of cancellation
to Eagle Bear. *See id.* Eagle Bear failed to cure its violation within that 10-day
period. The record appears to establish that the BIA then exercised its authority to
cancel the lease on June 10, 2008. *See* 25 C.F.R. § 162.618 (2008); (Doc. 14-1 at 3.)
Eagle Bear filed a timely appeal. Eagle Bear's appeal effectively stayed the

cancellation decision for the duration of the appeal. *See* 25 C.F.R. § 162.621 (2008). A ruling by the BIA Rocky Mountain Regional Director constitutes the only action that could overturn the lease cancellation. *See* 25 C.F.R. § 2.4.

Eagle Bear withdrew its appeal on its own accord "pursuant to [its] discussions" with BIA realty staff. (Doc. 14-1 at 9.) Eagle Bear's withdrawal of the appeal made the lease cancellation effective. 25 C.F.R. § 162.621 (2008); *see also* 25 C.F.R. 2.6(b) ("Decisions made by officials of the Bureau of Indian Affairs shall be effective when the time for filing a notice of appeal has expired and no notice of appeal has been filed."). Nothing in the record indicates that the BIA's regional director took any action to overturn the cancellation. In fact, nothing in the record indicates that the BIA so much as acknowledged Eagle Bear's claim on January 5, 2009, that "the lease [was] current." (*See* Doc 14-1 at 9.) The BIA's decision to cancel the lease in 2008 thus would have proved final through the administrative procedures of the BIA. *See* 25 C.F.R. § 162.621 (2008). The record before the Court contains no document to indicate that the BIA Rocky Mountain Regional Director took any step to overturn the lease cancellation. No lease would exist between Eagle Bear and the Blackfeet Nation under the circumstances.

Eagle Bear argues that the lease was not cancelled because the BIA continued to operate as if the lease remained in effect until 2017. The BIA lacks authority to revive a cancelled lease, however, without the consent of the Blackfeet Nation. *See*

11

*Moody v. United States*, 931 F.3d 1136, 1142 (Fed. Cir. 2019). The Court questions how the BIA's alleged oral representations to the contrary could have any effect in overturning the final cancellation of a lease. *Id. Moody v. United States*, 931 F.3d 1136, proves closely analogous.

The plaintiffs in *Moody* failed to pay rent for agricultural leases on tribal lands. 931 F.3d at 1138. The BIA cancelled the leases for untimely payment. *Id.* The plaintiffs provided the BIA full payment for the past-due rents within the 30-day appeal period. *Id.* at 1139. The BIA orally informed the plaintiffs that "they did not need to appeal, [and] could continue farming the land according to the leases." *Id.* Despite the BIA's oral representations, the Federal Circuit determined that the BIA had cancelled the leases. *Id.* at 1142.

The Federal Circuit reasoned that "[i]t is difficult to see how the United States, without specific authorization, could enter into an implied-in-fact contract [. . .] on behalf of the tribe." *Id.* "The BIA does not have general authority to lease land held for the benefit of a tribe unless it receives direct authorization from the tribe." *Id.* (citing 25 C.F.R. § 162.207(a)). The Federal Circuit determined that the plaintiffs could "not present any salient legal support for their position that the BIA can revive a cancelled lease without tribal authorization." *Id.*

Eagle Bear's actions based on the record presented appear to mirror those of the plaintiffs in *Moody*. Eagle Bear was delinquent on its lease payments. (Doc. 14-

12

1 at 6-8.) The BIA eventually cancelled the lease between Eagle Bear and the Blackfeet Nation for delinquent payment. (Doc. 25-6.) Eagle Bear made payment after the BIA had cancelled the lease and appears to have entered into an implied-in-fact contract similar to the one in *Moody*. (Doc. 14-1 at 4-5.) Eagle Bear now argues that the lease continued as a result of its late payment. (*Id.* at 9; Doc. 5-3 at 9.) Eagle Bear also attempts to rely on unverified oral representations by the BIA suggesting that the lease would continue. (Doc 5-3 at 10.)

The Federal Circuit rejected the argument that the lease persists based on the BIA's oral representations. *Moody*, 931 F.3d at 1142. The Court fails to understand how that same argument could be persuasive here. Eagle Bear and the BIA remain beholden to the BIA's administrative process and regulations. *See* 25 C.F.R. § 162.001 et seq. The BIA's apparent oral communications with William Brooke regarding lease reinstatement fail to cure Eagle Bear's disregard of BIA regulations. *See Moody*, 931 F.3d at 1142. The record suggests that the lease has been cancelled in 2008 when Plaintiffs failed to complete their appeal.

### ii.    Blackfeet Tribal Court jurisdiction over Plaintiffs

In light of the facts in the record pointing to the lease having been cancelled by the BIA in 2008, the analysis for Blackfeet Tribal Court jurisdiction in this instance closely resembles the tribal court jurisdictional question in *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011) ("*Water*

*Wheel*"). In *Water Wheel*, Robert Johnson, a non-Indian, controlled and operated the Water Wheel Camp on tribal lands through a lease agreement with the Colorado River Indian Tribes ("CRIT"). *Id.* at 805. Johnson continued to operate Water Wheel after the lease agreement with the CRIT had been terminated. *Id.*

The CRIT sued Johnson and Water Wheel in tribal court. *Id.* at 805-06. Johnson sought an injunction in federal court to challenge tribal court jurisdiction. *Id.* The Ninth Circuit determined that "through its sovereign authority over tribal land, the [tribe] had power to exclude Water Wheel and Johnson, who were trespassers on the tribe's land and had violated the conditions of their entry." *Id.* at 811. The tribe's adjudicatory authority included claims of eviction, unpaid rent, damages from the tribe's loss of use of their property, and attorney's fees. *Id.*

Plaintiffs seek to disregard *Water Wheel* and instead point to *Montana v. United States*, 450 U.S. 544 (1981), as controlling this case. The Ninth Circuit determined in *Water Wheel*, however, that *Montana* did not apply to the circumstances of non-Indians operating on tribal land. *Water Wheel*, 642 F.3d at 810 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–45 (1982)). No inherent state interest needed to be considered as the activity directly interfered with the tribe's inherent power to exclude and manage its own land. *Id.* at 814. *Montana* only limits a tribe's ability to regulate non-Indians on non-tribal land. *Id.*; *see also Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa, Inc.*, 715 F.3d. 1196, 1204.

14

The *Montana* limits on a tribe's power to exclude do not apply *on tribal land*. *Id.* The CRIT's power to exclude non-Indians necessarily included the accompanying power to regulate the activities of non-Indians on tribal land. *Water Wheel*, 642 F.3d at 812. The Ninth Circuit made this point clear: "where the non-Indian activity in question occurred on tribal land, the activity interfered directly with the tribe's inherent powers to exclude and manage its own lands, and there are no competing state interests at play, the tribe's status as landowner is enough to support regulatory jurisdiction without considering *Montana*." *Id.* at 814. The Ninth Circuit concluded that, even if *Montana* had applied, the lease agreement constituted a sufficient consensual connection between Water Wheel and the CRIT for *Montana*'s first exception to have been met. *Id.* at 817.

William Brooke is a non-Indian who controls and operates a recreational area on Blackfeet tribal land. Land ownership status may prove a dispositive factor in determining whether to uphold a tribe's regulation of non-Indians. *Nevada v. Hicks*, 533 U.S. 353, 360 (2001); *Grand Canyon Skywalk*, 715 F.3d. 1196, 1204. Similar to *Water Wheel* or *Grand Canyon Skywalk*, the "access to valuable tribal land" represents "the essential basis for the agreement." *Grand Canyon Skywalk*, 715 F.3d.at 1204. Indian tribes maintain broad regulatory authority over the conduct of both tribal and non-tribal members on Indian land. *Strate v. A–1 Contractors*, 520

U.S. 438, 454; *Grand Canyon Skywalk*, 715 F.3d at 1204; *Water Wheel*, 642 F.3d at 804-05.

The Ninth Circuit provided further guidance as to the proper application of *Montana* to tribal lands in *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002). A tribal member was involved in a vehicle collision with a non-member's horse that had wandered onto a BIA road within an Indian reservation. 309 F.3d at 535-36. The tribal member sued the non-member in tribal court. *Id.* at 536. The non-member sought relief in federal court. *Id.*

The Ninth Circuit reversed the district court's dismissal based on itsconclusion that the federal regulations applicable to the tribal right-of-way grant to the BIA differed from the state highway at issue in *Strate*. *Id.* at 537. The U.S. Supreme Court determined in *Strate* that the tribe had relinquished all gatekeeping rights over the state highway right-of-way. *Strate*, 520 U.S. at 455-56. The Ninth Circuit contrasted this total relinquishment of gatekeeping rights over a state highway in *Strate* with a BIA road. The Ninth Circuit recognized the BIA road to be an "Indian reservation road" over which the tribe retained significant tribal responsibilities and tribal control that reserved the tribe's gatekeeping authority. *McDonald*, 309 F.3d at 537-40. The Ninth Circuit relied, in part, on the fiduciary nature of the relationship between the tribe and the BIA in determining that the grant of a right-of-way to the BIA did not encumber significantly the tribe's right to

occupy and exclude from that tribal property. *Id.* at 538; *see also Takeda Pharms. America, Inc. v. Conelly*, 2015 WL 10985374 at *3-4 (D. Mont. 2015) (discussing fiduciary responsibilities of BIA in administering Public Health Service's lease of tribal land).

Eagle Bear continues to operate the KOA campground on the Blackfeet Nation's tribal land despite the lease agreement with the Blackfeet Nation apparently having been cancelled by the BIA in 2008. Under *Water Wheel*, the Blackfeet Tribal Court would possess jurisdiction to hear claims relating to the alleged trespass of Eagle Bear and William Brooke on Blackfeet tribal lands. *Id.* at 819-820. The Ninth Circuit in *Water Wheel* squarely addressed Brooke's arguments that he cannot be sued in his individual capacity. *Id.* Brooke stands subject to tribal jurisdiction to the extent he is not protected by the corporate structure of Eagle Bear as the alleged holdover tenant. *Id.*

Even if *Montana* were the correct analysis to apply to this case, the first exception still would indicate tribal court jurisdiction appropriate. The first *Montana* exception exists where non-Indians "enter consensual relationships with the tribe or its members." *See Montana*, 450 U.S. at 566. William Brooke and Eagle Bear operated the KOA campground on tribal land. William Brooke and Eagle Bear voluntarily entered into a consensual relationship with the Blackfeet Nation to operate that business on tribal land. *See id.*

Plaintiffs make a myriad of other arguments that could preclude tribal court jurisdiction. None prove persuasive. The apparent cancellation of the lease by the BIA in 2008 based on the record presented would nullify some of Plaintiffs' arguments. The lease required that the parties participate in arbitration and provided that this Court maintains jurisdiction over disputes arising from the lease. (Doc. 1-2 at 23, 37-38.) Plaintiffs argue, under the assumption that the lease remains in effect, that the Court must enforce those terms. Given that the lease appears to have been cancelled in 2008, however, those terms would not apply to this claim for a preliminary injunction. Plaintiffs might have argued that the lease's forum-selection or arbitration clauses should survive the lease cancellation. The Blackfeet Nation's claims would not arise out of the terms of the cancelled lease and so that argument too would fail.

Plaintiffs also argue that the Blackfeet Nation must exhaust administrative remedies before bringing suit in tribal court. As discussed above, the Blackfeet Nation and Plaintiffs appear to have exhausted BIA's administrative proceedings with respect to the lease. The cancellation would have become final in 2008 once the lease cancellation was not overturned on appeal. *See* 25 C.F.R. §§ 162.621, 2.6b (2008). The conclusion of the BIA's proceedings would mean that the lease between the Blackfeet Nation and Eagle Bear no longer exists. *See Moody*, 931 F.3d at 1138. The BIA lacks further authority to deliberate over the apparently cancelled lease

agreement. *See id.* The Blackfeet Nation must exhaust no further administrative remedies before bringing its complaint in tribal court.

As the administrator of the lease agreement, the BIA may have been a necessary party if the Blackfeet Nation's complaint challenged terms of a still-existing lease. *See* Fed. R. Civ. P. 19(a)(1). The BIA does not appear to be a necessary party to the Blackfeet Nation's suit in the Blackfeet Tribal Court. The apparent termination of the lease by the BIA in 2008 would mean that none of the Blackfeet Nation's claims arise from the now terminated lease's terms.

Plaintiffs' argument that the Blackfeet Nation's complaint raises federal questions requires the Court to look at the nature of the claims brought by the Blackfeet Nation. The Blackfeet Nation's complaint alleges the following claims: 1) trespass; 2) accounting of all rents and profits since June 10, 2008; 3) unauthorized use of Blackfeet land; 4) fraudulent misrepresentation; and 5) failure to follow Blackfeet tribal law, particularly tax law. (Doc. 1-3.) The claims in the Blackfeet Nation's complaint raise no apparent federal questions. The Blackfeet Tribal Court possesses authority to hear cases of trespass on tribal land and may determine damages for unauthorized use of tribal land if so established. *See Water Wheel,* 642 F.3d at 811. Fraudulent misrepresentation and failure to follow Blackfeet tribal law likewise pose no questions of federal law.

19

Given that the record currently before the Court appears to establish that the BIA cancelled the lease between Eagle Bear and the Blackfeet Nation in 2008, Plaintiffs do not raise "serious questions going to the merits." *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). Likelihood of success on the merits thus weighs heavily in favor of the Blackfeet Nation. *See Grand Canyon Skywalk*, 715 P.3d at 1205.

### b.  Irreparable Harm

A court may grant a preliminary injunction or temporary restraining order to preserve the status quo pending final determination of an action. *See Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Plaintiffs argue that an injunction proves necessary to prevent the Blackfeet Tribal Court from improperly exercising jurisdiction and from evicting Eagle Bear from Blackfeet Nation lands. (Doc. 5 at 29-30.) Plaintiffs also argue that the BIA and this Court would be deprived of rightful authority to make a determination in this case. *Id.*

Plaintiffs' argument that the BIA and this Court would be deprived authority to make a determination proves unavailing. The BIA would lack further authority to make determinations about the lease that it apparently cancelled in 2008. This Court, too, would not properly exercise jurisdiction over the case if the BIA cancelled the lease in 2008 and the Blackfeet Nation's claims would not arise from the terms of the cancelled lease.

The Court agrees that Plaintiffs would suffer irreparable harm if sued in a court that plainly lacked jurisdiction. The record at this point demonstrates, however, that the Blackfeet Tribal Court maintains proper jurisdiction. No irreparable harm befalls a party for being hailed into a court that properly exercises jurisdiction. Plaintiffs' concern that they be may be evicted as a result of the tribal court proceeding remains persuasive as Eagle Bear's operations would be harmed irreparably by an eviction. *See, e.g.*, *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.2001) (holding that evidence of loss of customer goodwill supports finding of irreparable harm). The Court thus determines that Plaintiffs would suffer irreparable harm. This prong weighs in favor of the Plaintiffs

### c. **Balance of Equities**

The Court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotations omitted). Plaintiffs argue that the potential harm of a wrongful eviction outweighs the Blackfeet Nation's potential delay in receipt of alleged damages. (Doc. 5 at 30-31.) The Blackfeet Nation alleges that Plaintiffs come before the Court with unclean hands based on their failure to make payments required by the lease. (Doc. 14 at 28-29.)

The record before the Court proves insufficient to demonstrate that Plaintiffs have acted with unclean hands. The record demonstrates that Plaintiffs frequently have made untimely lease payments to the Blackfeet Nation. (*See* Doc. 14-1 at 6-8). This apparent breach of the lease agreement does not necessarily establish unclean hands sufficient to bar equitable consideration for Plaintiffs. *Cf. Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir.2002) (stating that a party has unclean hands when it is "tainted with inequitableness or bad faith relative to the matter in which he seeks [equitable] relief.").

The Court agrees that Plaintiffs would suffer harm caused by an eviction from Blackfeet Nation land. As to this prong, however, the Court must balance the potential harm to the Blackfeet Nation that would arise from by granting the preliminary injunction. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). In granting the preliminary injunction, the Court would cause the Blackfeet Nation to experience delay to begin using its lands for its benefit and to recover damages for Plaintiffs' allegedly illegal use of its land. The Blackfeet Nation would also not be able to prohibit Eagle Bear from removing property on Blackfeet Nation land. These factors prove significant. After weighing the equitable considerations, the Court determines that the equities push against each other and that the balance does not sway toward either Party.

22

### d. Public Interest

Plaintiffs argue that the public possesses a strong interest in "protecting administrative agency authority and promoting judicial efficiency." (Doc. 5 at 31 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992))). Plaintiffs argue accordingly that recognizing the BIA's authority and enforcing the administrative process furthers the public interest. *Id.* Plaintiffs also argue that enforcing the lease's forum selection and arbitration clause promotes the public's interest in protecting contractual expectations. *Id.*

The Court agrees that the public has an interest in protecting the BIA's authority and in enforcing the BIA's administrative procedures. The enforcement of the BIA's administrative authority at this stage, however, cuts against Plaintiffs. The BIA appears to have cancelled the lease in 2008. The BIA would lack subsequent authority to oversee disputes arising from the lease cancellation. The public has no interest in enforcing authority that an agency does not possess. The public, similarly, lacks an interest in enforcing forum selection or arbitration clauses in a terminated contract, where a lawsuit related to a terminated contract does not arise from the terms of that contract.

The Blackfeet Nation argues that the public and federal government have an interest in promoting Indian Nation self-government. (Doc. 14 at 29.) Congress has demonstrated a policy of supporting tribal self-government and self-determination.

*Nat'l Farmers Union Ins. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985). The Ninth Circuit requires "deference to the tribal court as the appropriate court of first impression to determine its jurisdiction" when jurisdiction is not plainly lacking. *Grand Canyon Skywalk*, 715 F.3d at 1199. The Blackfeet Nation has the stronger argument. The Court recognizes a significant public interest in the principles of comity with the Blackfeet Tribal Court, where appropriate. This appears to be an appropriate instance. The public interest prong weighs in favor of the Blackfeet Nation.

### e.  Weighing the Factors

A preliminary injunction represents an extraordinary remedy, that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. A preliminary injunction proves inappropriate at this point. Based on the record before the Court, it appears the BIA cancelled the lease between Eagle Bear and the Blackfeet Nation in 2008. Plaintiffs thus fail to show likelihood of success on the merits. The irreparable harm prong admittedly tilts slightly toward Plaintiffs, but the public interest prong proves to be favorable to the Blackfeet Nation. Given the balance of the preliminary injunction analysis the Court will deny Plaintiffs' Motion for Preliminary Injunction. (Doc. 4).

### ORDER

Accordingly, **IT IS ORDERED** that:

24

- Plaintiffs' Motion for Preliminary Injunction (Doc. 4) is **DENIED**.

Dated this 17th day of November, 2021.

Brian Morris, Chief District Judge
United States District Court